[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 2, 2003
THOMAS K. KAHN
CLERK

_____

No. 02-12277

_____

D. C. Docket No. 01-06250-CV-KMM

DISTRICT NO. 1 - MARINE ENGINEERS
BENEFICIAL ASS'N, AFL-CIO,

Plaintiff-Appellee,

versus

GFC CRANE CONSULTANTS, INC.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(June 2, 2003)**

Before BIRCH, DUBINA and KRAVITCH, Circuit Judges.

BIRCH, Circuit Judge:

In this case, we must decide whether a continuation clause in a collective

bargaining agreement, which is textually applicable only to proposed modifications of the agreement, should nevertheless be applied to terminations of the agreement. The district court, in ordering compulsory arbitration of the grievances of two discharged employees, held that the contract continued in force even after termination. We **REVERSE**.

## I. BACKGROUND

G.F.C Crane Consultants, Inc. ("GFC"), as part of its business, maintains, operates, and repairs cranes of the Port Everglades Authority in Florida, and hires union workers to accomplish that end. On 16 August 1995, GFC and the union, District No. 1, Marine Engineers Beneficial Association, AFL-CIO ("MEBA"), entered into a collective bargaining agreement ("CBA") that purported, among other things, to provide an "orderly and peaceful procedure in the settlement of differences" between employer and employee. R2-39, Ex.1 at § 1.1. An employee with a grievance must first approach the senior port engineer, who must respond to the grievance within five days. If the employee or the union is not satisfied with the senior port engineer's resolution of the grievance, then either may bring the grievance to the attention of the company, GFC, which will meet with the employee and the union representative in an attempt to resolve the problem. If the decision reached by the company following such meeting is unacceptable to the

2

union, then the dispute is submitted to final, binding arbitration.

The collective bargaining agreement spanned a five-year term, set to end on 14 August 2000. After that five-year term, the agreement would be automatically renewed on a year-to-year basis "unless either [MEBA or GFC] shall notify the other, in writing, . . . that it desires to modify [the] Agreement." Id. at § 36.1. If a modification is proposed, then the parties retire to negotiations, during which time "[t]he terms of the Agreement at the time of notice to modify was given shall continue in effect until mutual agreement on the proposed modifications or an impasse has been reached."[1] Id. This type of provision, which we will refer to as a "continuation clause," serves to bridge the gap during renegotiations of labor contracts or provide for an extension of contract provisions following termination. In the agreement between GFC and MEBA, there is no explicit mention in the

---

[1] The full text of the clause is reproduced below:

**ARTICLE 36**
**TERM OF AGREEMENT**

36.1 The provisions of this Agreement shall become effective from August 14, 1995, and shall remain in full force and effect until August 14, 2000. It shall automatically be renewed from year to year thereafter unless either party shall notify the other, in writing, at least sixty (60) days prior but no sooner than ninety (90) days prior to the expiration or anniversary date, that it desires to modify this Agreement. In the event that such notice is given, negotiations shall begin not later than thirty (30) days prior to the expiration or anniversary date. The terms of the Agreement at the time of notice to modify was given shall continue in effect until mutual agreement on the proposed modifications or an impasse has been reached.

"continuation clause" or anywhere else in the agreement of the procedure to follow for termination, as opposed to modification, of the agreement, and it is around that omission that the current litigation rages.

As noted above, the original five-year term of the agreement was set to expire on 14 August 2000. MEBA properly notified GFC of its wish to modify the agreement on 16 May 2000. In response, GFC sent notice on 30 May 2000 that it was terminating the agreement as of the original expiration date, but that it was available for negotiations on the subject of an entirely new agreement. Given these revelations, the parties agreed in writing to extend the terms of the agreement for another thirty days, to 13 September 2000,[2] and to commence negotiations. These negotiations began in September and continued through the end of the year. On 21 January 2001, GFC declared bargaining to be at an impasse.

During the course of these negotiations and according to the grievance provisions in the original collective bargaining agreement, MEBA lodged complaints with GFC concerning employee issues that arose *after* 13 September 2000, including the termination of two port engineers. GFC denied the grievances, and MEBA attempted to start arbitration. GFC, however, refused to arbitrate.

---

[2] The operative text of the extension agreement provided that "[t]he Agreement between GFC Crane Consultants, Inc. and District No. 1, MEBA (AFL-CIO) dated August 14, 1995 through August 13, 2000 is hereby extended to 12:01 a.m. on September 13, 2000 by mutual agreement of the parties." R2-44 at 3.

According to GFC, its notice of termination would have ended the agreement on 14 August 2000, the end of the original five-year term. GFC contends that although it agreed to extend the terms of that agreement for a month, until 13 September 2000, after that date the agreement's arbitration provisions were no longer in effect.

MEBA filed a complaint in the United States District Court for the Southern District of Florida, seeking to compel GFC to submit the grievances to arbitration. MEBA and GFC both filed motions for summary judgment. The district court ruled for MEBA and ordered that arbitration should be held per the collective bargaining agreement. Adopting MEBA's argument, the district court reasoned that a notice for modification of the agreement and an impasse in negotiations over that modification were prerequisites for discontinuation of the agreement's terms. According to the district court, GFC's notice of termination operated as the functional equivalent of a notice to modify and therefore had the effect of continuing the agreement during negotiations until a new agreement or impasse was reached. GFC appeals that decision to this court.

## II. DISCUSSION

A.     Standard of Review

A district court's grant of summary judgment is reviewed de novo, and, as in the district court, all evidence is viewed in the light most favorable to the non-

moving party.  <u>Adams v. Poag</u>, 61 F.3d 1537, 1542 (11th Cir. 1995).

B.      <u>Functional Equivalence of Notices to Modify and Notices to Terminate</u>

According to GFC, the continuation clause in the agreement operated to continue the terms of the agreement through modification discussions, but had no effect if one party chose to terminate.  GFC points to the plain language of the clause, which states that "[t]he terms of the Agreement at the time of <u>notice to modify</u> was given shall continue in effect until mutual agreement on the proposed <u>modifications</u> or an impasse has been reached." R2-39, Ex. 1 at § 36.1 (emphasis added).  MEBA argues, as it did to the district court, that the contractual continuation provision covered both notices of modification and notices of termination, based on the similar effects each type of notice would have under the federal labor law paradigm.

To bolster its interpretation, MEBA invokes the presumption of arbitrability with which courts must examine arbitration provisions in collective bargaining agreements.  Section 301 of the Labor Management Relations Act, codified at 29 U.S.C. § 185, authorizes federal courts to create a body of federal labor law to govern the interpretation and enforcement of collective bargaining agreements, consistent with, among other goals, the clear congressional policy in favor of agreements to arbitrate labor disputes.  <u>See Textile Workers Union of America v.</u>

6

Lincoln Mills of Ala., 353 U.S. 448, 455, 458-59, 77 S. Ct. 912, 917, 919 (1957). Before ordering specific performance of an agreement to arbitrate, we must first determine whether the parties have agreed to arbitrate the particular matter at issue. See Refinery Employees Union v. Continental Oil Co., 268 F.2d 447, 452 (5th Cir. 1959). In proceeding with this analysis, "there is a presumption of arbitrability in the sense that an order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Wright v. Universal Mar. Serv. Corp., 525 U.S. 70, 78, 119 S. Ct. 391, 395 (1998) (citations and internal quotations omitted).

However, it is with the positive assurance requisite for overcoming the presumption of arbitrability that we say that notices of modification and notices of termination are two different creatures in this particular contract. Notices to modify and notices to terminate are not equivalent except in the face of contractual language that equates those types of notice. "[T]ermination and changes are different things." Local Union No. 28, IBEW v. Maryland Chapter Nat'l Elec. Contractors Ass'n, 194 F. Supp. 494, 501 (D. Md. 1961). We must decline, even in the face of the arbitrability presumption, to interchange terms that have separate meanings, even if they have similar effects.

Under either type of notice, the NLRA requires the parties to the agreement to negotiate in good faith with the end of reaching a new agreement, and certain terms of the contract would be statutorily continued during those negotiations. See 29 U.S.C. § 158(a)(5), (d); Litton Fin. Printing Div. v. NLRB, 501 U.S. 190, 206, 111 S. Ct. 2215, 2225 (1991). Most terms and conditions of employment that are mandatory subjects of bargaining survive by virtue of this statutory continuation effect and cannot be changed unilaterally until negotiations have reached impasse. Litton, 501 U.S. at 205-06, 111 S.Ct. at 2225. However, the fact that notices of termination and notices of modification have a similar effect under the statute does not necessarily mean that they should have a similar effect under a particular contract provision. Parties are free to construct contractual continuation provisions that go beyond the reach of the statutory continuation effect in order to enforce other provisions past the effective date of the CBA. In fact, MEBA is arguing that the contractual continuation provision extends continuation to the arbitration provisions of the contract, which would not be continued under the statute. Although a mandatory subject of bargaining, the Supreme Court has held that grievance arbitration obligations end upon expiration of the CBA unless the parties have agreed otherwise. Litton, 501 U.S. at 205-07, 111 S.Ct. 2115, 2225-26; see also Nolde Bros., Inc. v. Local No. 358, Bakery & Confectionary Workers Union,

8

430 U.S. 243, 250, 97 S. Ct. 1067, 1071-72 (1977). Obviously, these two types of notice, though with similar effects under the statute, may have radically different effects under the structure and language of a CBA, and, therefore, we decline to treat them identically under a contract to how we would under the statute.

Just because two types of notice have similar effects under federal labor law does not mean that the two types of notice should have similar effects under a contract which specifically includes one of those types of notice and fails to mention the other type of notice at all. Accordingly, we hold that, where a collective bargaining agreement contains a continuation clause triggered by notice of modification, but is silent as to the effect of a notice of termination, the continuation clause does not include the latter in the absence of compelling evidence to the contrary.

The case relied upon by MEBA and the district court to find these two types of notice to be "functionally equivalent" is inapposite. In Kaufman & Broad Home Sys., Inc. v. International Brotherhood of Firemen, 607 F.2d 1104, 1106 (5th Cir. 1979), the contract stated that "[t]his Agreement . . . shall remain in effect [and renew yearly] . . . , with the provision that should either party desire to terminate this Agreement or to modify any part thereof, it shall notify the other party in writing." (emphasis added). The union in Kaufman gave proper notice that it

wished to modify the Agreement. Later, the union argued that the notice of modification prevented automatic renewal of the agreement, based on the language quoted above. The company contended that a notice of termination would prevent renewal, but that a notice of modification was qualitatively different. The Fifth Circuit found that "the structure of the clause is such that notice to terminate and notice to modify are functionally equivalent in the extension clause," id. at 1109 (emphasis added), and held that the notice of modification prevented renewal.

Modification and termination were "functionally equivalent" in Kaufman because the language of the agreement gave no extra weight or effect to one or the other. Id. But, as recognized by the court in Kaufman, when the agreement distinguishes between modification and termination, for example, "[i]f an agreement only provides for notice to terminate," then, "it cannot reasonably be assumed that a notice to modify should have the same effect. Similarly, where the contract states the precise effect of a notice to modify, courts should enforce the provision as written." Id. at 1111 (citation omitted).

C. Permanence of Triggered Continuation Clause

At oral argument, MEBA offered an alternative theory whereby the contractual continuation clause should be given effect under these circumstances. MEBA contends that its notice of modification clearly triggered the contractual

continuation clause, and the language of that clause precluded GFC from stopping the continuation effect unless it reached a new agreement with MEBA or declared impasse. According to the agreement, "[t]he terms of the Agreement at the time of notice to modify was given shall continue in effect until mutual agreement on the proposed modifications or an impasse has been reached." R2-39, Ex. 1 at § 36.1. MEBA believes that this language clearly states two exclusive conditions for ending continuation once a notice to modify has been tendered, and a notice of termination is not one of those conditions.

Federal labor law provides a statutory right of termination, of which GFC has taken advantage in this case. See 29 U.S.C. § 158(d).[3] Though the parties to a

---

[3] That section states in relevant part:

> [W]here there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification–
>
> (1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;
>
> (2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;
>
> (3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

CBA could restrict the ability of a party to terminate the agreement, the contract between GFC and MEBA is wholly silent on the issue of termination. MEBA argues that, even with this absence of restriction, the contractual continuation clause can prevent GFC from terminating and receiving the benefits of statutory termination. We disagree.

A notice of statutory termination results in a similar effect as a notice of modification under the agreement in this case: the parties are required by statute to negotiate in good faith, and certain provisions of the preexisting agreement are continued.[4] Once the termination becomes effective, existing contractual terms do not have force by virtue of the contract, in the absence of explicit contractual language to the contrary, but rather by virtue of the statutorily-based continuation effect embodied by the "unilateral change" doctrine. <u>Litton</u>, 501 U.S. at 206, 111 S. Ct. at 2225 (1991).

---

(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later.

29 U.S.C. § 158(d). This section authorizes both notices of termination and notices of modification, but because modification rules are provided in the agreement between GFC and MEBA, only the termination authorization is relevant.

[4] <u>Pre</u>-termination, <u>all</u> terms of the existing agreement must be continued for sixty days from date of notice of termination, or until actual termination of the agreement, whichever comes later. 29 U.S.C. § 158(d)(4). This effect is not the statutory continuation effect on which we focus in the text. Rather, we focus on the boundaries of the <u>post</u>-termination relationship between the parties, and, specifically, which terms of the agreement are carried over post-termination to preserve the status quo.

Here, the triggered contract clause was to continue the terms of the agreement until the parties reached an agreement on the modification proposals or impasse was reached on those modification proposals. By statutorily terminating, GFC made those contract-based modification negotiations, and, by extension, the contract continuation clause, moot.

If the modification negotiations were not moot, and we were to accept MEBA's interpretation of the continuation clause, GFC would be denied by implication the full panoply of effects flowing from its statutory right to terminate the agreement. Under the "unilateral change" doctrine, when an existing agreement has expired and negotiations on a new agreement have yet to be completed, a unilateral change in those terms and conditions of the agreement that are subject of mandatory bargaining under the NLRA constitutes a breach of the statutory requirement of good faith. See NLRB v. Katz, 369 U.S. 736, 743, 82 S. Ct. 1107, 1111 (1962). Therefore, no unilateral changes in those terms of the agreement, even after expiration, is appropriate unless impasse has been reached in negotiations. However, this statutory continuation effect is not as comprehensive as the contractual continuation effect triggered in this case. Post-termination, a party may alter the method of dispute resolution, at least as to those claims arising post-termination. See Litton, 501 U.S. at 205-06, 111 S. Ct. at 2225. A party may

13

refuse to abide by the strike or lockout provisions in the agreement, to the same extent that other terms of dispute resolution are not continued.  See id. at 199, 111 S. Ct. at 2222.

Under the circumstances of this case, to enforce a triggered contractual continuation clause even after proper statutory termination is to deny GFC the benefits arising from statutory termination, including, most importantly, a different and less-inclusive statutory continuation policy.  Denying GFC the right to unilaterally alter certain terms of the agreement, including terms of dispute resolution covering disputes arising after contract termination, and terms restricting its right to lock out employees, denies GFC its rightful bargaining position under federal labor law.  The termination right, like all rights granted by statute, may not be waived except by clear, explicit language.  See Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708, 103 S. Ct. 1467, 1477 (1983) ("[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.'  More succinctly, the waiver must be clear and unmistakable.").  The type of inference that MEBA suggests we make from the text of the continuation clause to effect a waiver is exactly the sort of imprecise language to which we cannot attribute waiver.

For both of its arguments, MEBA's position is also undermined by the

14

execution of the 30-day extension agreement by the parties when faced with a looming termination date. If the modification/continuation clause was to effectively continue the agreement, then there was no need for the parties to enter into a separate extension agreement. MEBA's argument that the extension agreement was executed only for additional security is specious.

We therefore agree with GFC that three options were available to the parties under the agreement as the automatic renewal date approached: (1) they could let the day pass, and the original agreement would be automatically renewed for a one-year period; (2) a party could give notice of its wish to modify the agreement, which would prompt negotiations, during which the terms of the original agreement would be carried over until impasse was reached, and, according to the agreement, potentially disastrous bargaining tactics, including strikes and lockouts, would be curtailed strictly; or (3) a party could give notice of its intent to terminate the agreement, which would result in a termination on the expiration date, followed by a good-faith bargaining session in which the status quo is preserved under the "unilateral change" doctrine, and either side could employ any of the bargaining pressures it possessed, including lockouts and strikes. "Abstract logical analysis might find inconsistency between the command of the [NLRA] to negotiate toward an agreement in good faith and the legitimacy of the use of economic weapons . . .

15

to induce one party to come to the terms desired by the other. But the truth of the matter is that at the present statutory stage of our national labor relations policy, the two factors – necessity for good-faith bargaining between parties, and the availability of economic pressure devices to each to make the other party incline to agree on one's terms – exist side by side." NLRB v. Insurance Agents' Internal Union, 361 U.S. 477, 489, 80 S. Ct. 419, 427 (1960).

## III. CONCLUSION

The end result of our discussion is that GFC was not obligated by its agreement with MEBA to arbitrate labor-management disputes arising after 13 September 2001. The agreement between the parties was terminated on that date, with no arbitration terms applicable to disputes arising after termination. The district court's ruling to the contrary was error. Accordingly, we **REVERSE.**

KRAVITCH, Circuit Judge, concurring:

In the district court's well-reasoned order it concluded that this case turned on whether "the parties intended to extend the terms of the agreement during negotiations following a notice of *termination*, or only during negotiations following a notice to *modify*." I agree with the district court that this case turns on the parties' intent. Because, however, MEBA failed to present evidence to show that the parties intended the word "modify" to mean "modify or terminate" in the CBA's continuation clause, I concur in parts I, II A, II B, and III of the majority's opinion. Therefore, although the district court offered sound reasoning for its determination that a CBA continuation clause that expressly only requires terms to continue after notice to modify is tendered *could* be interpreted to read "modify *or terminate*," I concur in the reversal because of a lack of evidence that the parties' intended that meaning in the CBA at issue in this case. I do not concur, however, in part II C of the majority opinion, as I consider it dicta unnecessary to the disposition of this case.